UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
U.S. INFORMATION SYSTEMS, INC.,

                Plaintiff,          OPINION

     -against-               07 Civ. 127 (MGC)

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS LOCAL UNION NUMBER
3, AFL-CIO, ADCO ELECTRICAL CORPORATION,
FIVE STAR ELECTRIC CORPORATION, FOREST
ELECTRIC CORPORATION, HUGH O'KANE ELECTRIC
COMPANY LLC, NEAD INFORMATION SYSTEMS,
INC., NEAD ELECTRIC, INC. and THE NEAD
ORGANIZATION, INC.,

                Defendants.

--------------------------------X

APPEARANCES:

       BLECHER & COLLINS, P.C.
       Attorneys for Plaintiff
       515 South Figueroa Street, 17th floor
       Los Angeles, California 90071

       By:  Maxwell M. Blecher, Esq.
           John E. Andrews, Esq.

       LAW OFFICES OF LAURA G. WEISS
       Attorneys for Plaintiff
       One Blue Hill Plaza, P.O. Box 1647
       Pearl River, New York 10965

       By:  Laura G. Weiss, Esq.

       TROUTMAN SANDERS LLP
       Attorneys for Defendant IBEW Local 3
       405 Lexington Avenue
       New York, New York 10174

       By:  Barry J. Brett, Esq.
           Stephen F. Harmon, Esq.
           Daniel N. Anziska, Esq.

```
MURTAGH, COHEN & BYRNE
Attorneys for Defendant ADCO Electrical Corp.
100 North Park Avenue
Rockville Centre, New York 11570

By:  Edward T. Byrne, Esq.

MOHEN & TREACY LLP
Attorneys for Defendant Hugh O'Kane Electric Co. LLC
186 Birch Hill Road
Locust Valley, New York 11560

By:  Thomas P. Mohen, Esq.

LEVIN & GLASSER, P.C.
Attorneys for Defendant Five Star Electric Corp.
420 Lexington Avenue, Suite 805
New York, New York 10170

By:  Steven I. Levin, Esq.
     Paul G. Burns, Esq.

SCHLAM STONE & DOLAN LLP
Attorneys for Defendants Nead Information Systems,
Inc., Nead Electric, Inc., and The Nead Organization,
Inc.
26 Broadway
New York, New York 10004

By:  Richard H. Dolan, Esq.
     Jeffrey M. Eilender, Esq.
     John Lundin, Esq.
     Erik S. Groothuis, Esq.
```

**Cedarbaum, J.**

U.S. Information Systems, Inc. ("USIS") sues the

International Brotherhood of Electrical Workers Local Union

Number 3, AFL-CIO ("Local 3"), Nead Information Systems, Nead

Electric, Inc., and the Nead Organization, Inc. ("Nead"), ADCO

Electrical Corp., Five Star Electric Corp., and Hugh O'Kane

Electric Co. LLC (collectively "Defendants"),[1] for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. All of the defendants are subcontractors, with the exception of Local 3, a union. USIS sues all defendants except Local 3 for tortious interference with contract. Defendants move to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6), principally on the ground that USIS has not pleaded facts sufficient to allege an antitrust conspiracy.

For the following reasons, Defendants' motion is denied.

## I. BACKGROUND

### A. The facts alleged

In its Amended Complaint, USIS alleges the following facts, which are taken as true for the purposes of this motion.

### 1. General background

USIS is a subcontractor that installs telecommunications wiring in commercial buildings in the New York City metropolitan area. The employees of USIS belong to a union, the Communications Workers of America ("CWA"). USIS and its employees perform low-cost, low-voltage wiring installations used for the transmission of voice, data, and video over cable, radio,

---

[1] By stipulation filed July 13, 2007, Forest Electric Corp. is no longer a defendant.

or optical systems.  Their work is not regulated or licensed by any government entities.

The defendant subcontractors are in the business of installing electrical wiring in commercial buildings in New York. All of the defendant subcontractors use Local 3 labor.  Their employees perform high-cost, high-voltage wiring installations used for the transmission of electrical current.  By law, installers of electrical wiring must possess a valid license, follow the National Electrical Code, and comply with state and local building codes.

Contracts for telecommunications work are bid on and awarded separately from contracts for electrical work.  A general contractor could employ low-cost subcontractors such as USIS for telecommunications wiring and use high-cost subcontractors such as the Defendants only for electrical wiring.  USIS alleges, however, that several general contractors in New York have used Defendants not only for electrical wiring, but also for telecommunications wiring.  By using Defendants to install telecommunications wiring, these general contractors have, according to USIS, overpaid:  the general contractors could have saved one-third to one-half of the installation cost had they accepted the lower-priced bids made by USIS.

USIS alleges that Local 3, in conspiracy with the defendant subcontractors, coerces general contractors to use Local 3

subcontractors rather than CWA subcontractors.  A general

contractor who uses a CWA contractor for telecommunications work

"run[s] the risk of incurring work stoppages and slowdowns,

missing cutover dates, threatening move-in schedules and finding

the work done by the CWA vandalized or sabotaged."  (Amended

Complaint ¶ 50.)


## 2.  The alleged conspiracy

USIS alleges that in or about September of 1998, Robert

Eccles, the executive vice president of Nead Information Systems,

complained to Howard Cohen, business manager for Local 3, that

Nead was losing a large number of bids to CWA subcontractors.  On

September 1, 1998, Eccles wrote a letter to Mark Hansen, a

business agent for Local 3 (the "Eccles Letter"), stating that

"'[w]e are losing as much work to CWA as we are winning now and

getting worse,'" and soliciting a meeting with Local 3 "'to

discuss this problem and review any recommendations you may have

to competing in this market place.'"  (Amended Complaint ¶ 34

(quoting the Eccles Letter)).

In response to this communication, a meeting was held (the

"Local 3 Meeting") between unnamed "electrical [sub]contractors"

and "representatives of IBEW Local No. 3's hierarchy."  (Amended

Complaint ¶ 36.)  USIS also alleges that Nead wrote a memo

regarding that meeting (the "Nead Memo"), which indicated that

one issue for discussion was the "CWA Problem with Respect to Comp[et]ition S[c]enario, Procedure When Threatened by CWA and Future of Telecommunications with Local Three?" (Amended Complaint ¶ 36.) After the meeting, Local 3 decided to "continue[] its efforts to enforce the principles of the 'total job policy' with respect to firms hiring or considering CWA contractors." (Id. ¶ 36.) "Total job policy" means that Local 3 would seek to perform all of the wiring jobs, electrical and telecommunications, at a building site, and would put pressure on general contractors not to hire CWA subcontractors for the telecommunications jobs.

A section of the Amended Complaint titled "Specific Examples of Defendants' Illegal Acts" alleges fifteen instances, ten within the four-year statute of limitations period, in which USIS lost a bid to Local 3 and one of the defendant subcontractors. USIS notes that its list of lost bids is not exhaustive. The instances alleged display a common pattern in which USIS, using CWA labor, made a much lower bid than its competitors using Local 3 labor, but the job was ultimately awarded to a Local 3 subcontractor. In each case, the lower bid by USIS was passed over because of the general contractor's fear that Local 3 electricians on site would cause slowdowns and vandalize the property. The following three examples illustrate the pattern.

In October of 2007, at a project for Merrill Lynch, USIS was awarded the bid to perform a closed circuit television installation.  In response, Local 3 electricians at the site caused a one-week work delay.  The job was removed from USIS and given to defendant subcontractor Forest Electric, which used Local 3 labor.

In April of 2005, USIS bid on the PA and Access Control systems at a project for ZS Associates.  During a construction job meeting, the general contractor stated that, to avoid problems, the installation should be performed by Local 3.  A representative of ZS Associates called USIS and asked whether USIS could do the job using Local 3 labor, because "a substantial portion of the building was under construction," which meant that "there were electricians on site" who could "jeopardize tenant schedules" through threats and vandalism.  (Amended Complaint ¶ 52(g).)  USIS responded that it could not use Local 3 labor because its collective bargaining agreement required the use of CWA labor.  As a result, "one of the defendant conspirator electrical contractors was awarded the project."  (Id.)

In September of 2003, at a project for Clifford Chance Rogers & Wells, USIS was asked to prepare a bid for telecommunications work at a project on West 52nd Street.  USIS alleges that Stan Williams of Clifford Chance was informed by the building owner's representative that "Nead Electric was taking

the position that it would not put in conduit unless there were IBEW Local No. 3 wires going through them."  (Id. ¶ 52(e).)  Nead Electric reportedly "was displeased because they were not getting work from Clifford Chance and had complained to the union."  (Id.)  Mr. Williams "was visited by an IBEW Local No. 3 shop steward who reiterated the position that the Nead electricians would not install any more conduit if a CWA contractor was allowed to pull the cables through them."  (Id.)  As a result, "one of the Nead entities" was awarded the project.  (Id.)

## B.  The prior action

This is not the first time USIS has sued Defendants.  In July of 2000, USIS and two additional plaintiffs sued Local 3 and the defendant subcontractors (along with additional subcontractors not named in the current action), alleging violations of 15 U.S.C. §§ 1 & 2, tortious interference with contract, and additional state law claims.

In the prior action, USIS introduced evidence that members of Local 3, through work slowdowns, refusals to perform overtime, and jobsite vandalism, had pressured general contractors to remove USIS from building sites and reassign the telecommunications work to Local 3 subcontractors.  As evidence of a conspiracy between the subcontractor defendants and Local 3, USIS introduced the Eccles Letter and the Nead Memo, discussed

above in Section I.A.2.[2]  The Nead Memo contained "a list of

topics" to be discussed at the meeting between Nead and Local 3

representatives.  The topics included the "CWA Problem" and the

"procedure" to be followed "when threatened by CWA."  U.S. Info.

Sys., Inc. v. I.B.E.W. Local Union No. 3, No. 00 Civ. 4763, 2007

WL 2219513, at *11 (Aug. 3, 2007) (Francis, M.J.).

        Regarding the list of topics, "Mr. Eccles testified that he

was referring to the possibility of implementing a different wage

scale for [Local 3] workers who performed tel-data work, as

opposed to high voltage work, so that Local 3 contractors would

be better able to compete for telecommunications contracts."  Id.

Magistrate Judge Francis found that

> plaintiffs offer no evidence that representatives of
> Local 3 and the defendant contractors discussed the
> possibility of winning contracts by threatening to
> engage in vandalism or withhold overtime at that
> meeting or at any other time....  It is hardly
> surprising that contractors employing Local 3
> electricians would discuss the issue with union
> representatives.  The evidence submitted by the
> plaintiffs, even when taken as a whole, does not
> justify an inference that the list of topics for
> discussion drafted by Mr. Eccles was anything other

---

[2]

> In the Amended Complaint in the current action, USIS alleges
> that the conspiratorial meeting between representatives of
> Local 3 and the subcontractors took place as a "respon[se]
> to the[] concerns" raised by the Eccles Letter in September
> of 1998.  (Amended Complaint ¶ 36.)  That would place the
> meeting in late 1998.  However, in the prior action, the
> meeting was said to have "apparently t[aken] place in 1996
> or 1997."  U.S. Info. Sys., Inc. v. I.B.E.W. Local Union No.
> 3, No. 00 Civ. 4763, 2007 WL 2219513, at *11 (Aug. 3, 2007)
> (Francis, M.J.).  Despite this discrepancy, it appears that
> the same meeting is at issue.

> than an attempt to start a discussion with Local 3
> regarding the possibility of wage concessions or other
> legitimate ways to increase the competitiveness of
> Local 3 contractors in the telecommunications market.

Id. at *12. Magistrate Judge Francis also noted that there was

not "any direct evidence that any of the defendant contractors

besides [Nead] attended the meeting." Id. at *11 n.15.

Magistrate Judge Francis recommended that Defendants' motion for

summary judgment be granted.

Judge Berman, approving and adopting the Report of

Magistrate Judge Francis in its entirety, held that USIS had not

proven a conspiracy to violate the antitrust laws: "Judge

Francis concluded correctly that 'this Court cannot permit an

antitrust case to go to trial where the evidence is as consistent

with permissible competition as with illegal conspiracy.'" U.S.

Info. Sys., Inc. v. I.B.E.W. Local Union No. 3, No. 00 Civ. 4763,

2007 WL 2746902, at *2 (S.D.N.Y. Sept. 18, 2007) (brackets

omitted), notice of appeal filed, Sept. 28, 2007. "'If there

were proof that a few renegade members of Local 3 acted

independently to advance their perceived interests, that conduct

would not be attributable to any Defendant, much less prove a

conspiracy.'" Id. (quoting the Report of Magistrate Judge

Francis) (ellipses omitted).


## II. DISCUSSION

Under Fed. R. Civ. P. 12(b)(6), Defendants move to dismiss USIS's claims on five grounds: (1) claim and issue preclusion; (2) USIS fails to meet the pleading requirements of Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007) ("Twombly"); (3) USIS fails to allege factual support for the tortious interference claim; (4) USIS fails to allege an adverse effect on competition as a whole in the telecommunications installation market; and (5) Defendants' activity is exempt from antitrust scrutiny because the activity is part of the collective bargaining process.  A court adjudicating a motion to dismiss under Rule 12(b)(6) accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff.  Gibbons v. Fronton, 533 F. Supp. 2d 449, 452 (S.D.N.Y. 2008).

Section 1 of the Sherman Act, 15 U.S.C. § 1, forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States."  However, because "every contract is a restraint of trade," the Supreme Court has "repeatedly recognized [that] the Sherman Act was intended to prohibit only unreasonable restraints of trade."  NCAA v. Board of Regents of the Univ. of Okla., 468 U.S. 85, 98 (1984).

## A.  Preclusion

Defendants argue that issue and claim preclusion foreclose USIS's claims in the current action.  "Dismissal under Fed. R.

Civ. P. 12(b)(6) is appropriate when a defendant raises ... preclusion ... as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." Conopco, Inc. v. Roll Intern., 231 F.3d 82, 86 (2d Cir. 2000). Federal law applies when considering the preclusive effect of prior federal judgments. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).

## 1. Issue preclusion

Issue preclusion, also known as collateral estoppel, applies under federal law when a four-part test is met: (1) the identical issue must have been raised in a prior proceeding; (2) the issue must have been actually litigated and decided; (3) the precluded party must have had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue must have been necessary to support a valid and final judgment on the merits. Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998). Even when an appeal is pending, the final judgment being appealed has preclusive effect. See Conopco, 231 F.3d at 90 (2d Cir. 2000); Amcast Indus. Corp. v. Detrex Corp., 45 F.3d 155, 160 (7th Cir. 1995) (appealable judgments have preclusive effect, partly "to discourage the filing of a new suit when the loser of the prior suit still has a remedy in that suit"); 18A Wright, Miller &

Cooper, <u>Federal Practice & Procedure</u> § 4433 ("The bare act of taking an appeal is no more effective to defeat preclusion than a failure to appeal.").

Defendants rely on <u>Ramallo Bros. Printing, Inc. v. El Día, Inc.</u>, in which a commercial printer sued a newspaper for a second time regarding the paper's policy of accepting only those advertising supplements produced by a particular printer. 490 F.3d 86, 88 (1st Cir. 2007). In the prior litigation, the plaintiff had challenged the newspaper's policy as a violation of the Sherman Act, and the court had determined that there was no violation. In the second suit, the plaintiff again alleged an antitrust violation, this time regarding the newspaper's refusal to accept an advertising supplement that the plaintiff had printed itself and submitted. The Court held that the underlying issue in the second suit was identical to the issue in the first suit: whether the newspaper's single-printer policy violated the Sherman Act. Issue preclusion therefore foreclosed the second suit, notwithstanding the fact that the second suit involved events (the printing of the advertising supplement) not yet in existence at the time of the first suit.

Defendants argue that USIS's two suits are analogous to the two suits in <u>Ramallo Bros</u>. Although the current USIS suit alleges a series of events that post-date the events of the first suit, both suits involve the facts that (1) Eccles wrote a letter

to Hansen soliciting a meeting with Local 3 to discuss the CWA problem, (2) Nead produced a memo stating that the meeting should discuss the "CWA Problem" and the "Procedure When Threatened by CWA," and (3) after a general meeting between subcontractors and Local 3, it was decided that Local 3 would continue "to enforce the principles of the 'total job policy' with respect to firms hiring or considering CWA [sub]contractors." (Amended Complaint ¶ 36.)

Regarding these facts, the prior litigation between these same parties determined in a final judgment that there was no evidence of an antitrust conspiracy. U.S. Info. Sys., Inc., 2007 WL 2746902, at *1-*2. That determination collaterally estops any subsequent court from finding that these facts could be construed otherwise. Therefore, USIS cannot reargue in this case that the Eccles Letter, the Nead Memo, and the Local 3 Meeting are evidence of the formation of an antitrust conspiracy.

Defendants argue that USIS's entire suit should be dismissed under Ramallo Bros. because of the collateral estoppel of this one issue. However, Ramallo Bros. is distinguishable. In Ramallo Bros., the newspaper maintained a policy of dealing with a particular printer for its advertising supplements, and plaintiff challenged that policy twice in two different suits. Here, USIS alleges some facts that were part of the prior litigation and some facts that are new. USIS alleges several

instances in the past four years, post-dating the events of the prior litigation, in which Local 3 members pressured general contractors to refuse to do business with USIS. If the allegations from the past four years provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," Twombly, 127 S. Ct. at 1965, then USIS's new suit could go forward on the strength of the new allegations, notwithstanding the collateral estoppel with regard to the Eccles Letter, Nead Memo, and Local 3 Meeting. Whether the new allegations provide enough facts to satisfy Twombly is discussed below in Section II.B.

## 2. Claim preclusion

Claim preclusion, or res judicata, "'makes a final, valid judgment conclusive on the parties, and those in privity with them, as to all matters, fact and law, [that] were or should have been adjudicated in the proceeding.'" Waldman v. Village of Kiryas Joel, 207 F.3d 105, 108 (2d Cir. 2000) (quoting 1B Moore, Federal Practice ¶ 0.405[1], at III-7 (2d ed. 1996)). When defendants engage in a continuing course of conduct which gives rise to two different suits, the general rule is that "[c]laims arising subsequent to a prior action ... are not barred by res judicata regardless of whether they are premised on facts representing a continuance of the same 'course of conduct.'"

Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 383 (2d Cir. 2003).  A more complicated analysis applies where the later claim involves both "new" facts in the continuing course of conduct and "old" facts already covered by the prior litigation.  In such a case, "claim preclusion may apply," if the new facts "do not amount to a new claim."  Id. at 384.

For instance, in Waldman v. Village of Kiryas Joel, Waldman first sued the village for violations of the Establishment Clause, alleging that its dominant religious body controlled the local government and discriminated in the provision of public housing against dissidents and members of other religious bodies. 207 F.3d at 107.  That suit was dismissed with prejudice. Waldman then sued the village a second time, seeking the village's dissolution on the ground that its government was excessively entangled with religion.  The Second Circuit, noting that most of the facts in the two actions overlapped, asked whether "the facts essential to the second claim were already present in the first suit," id. at 112 (emphasis omitted), since "res judicata will not bar a suit based upon legally significant acts occurring after the filing of a prior suit that was itself based upon earlier acts," id. at 113 (emphasis in original).  The facts in the first suit included several instances of entanglement between the local government and the congregation, such as the requirement that a contribution be made to the

16

congregation before the village would issue a building permit, and the denial of public housing to persons who were not members of the congregation. The second suit included allegations of interference with dissidents' voting rights and an ordinance which effectively prohibited protestors from demonstrating in front of a rabbi's house. The Court found that the "new allegations made in the present complaint do not, either by themselves or to any degree not already demonstrated by the overlapping facts, establish" a claim for entanglement, but instead were "nothing more than additional instances of what was previously asserted." Id.

Here, USIS also alleges facts that were present in the prior litigation, i.e., the Eccles Letter, the Nead Memo, and the Local 3 Meeting. USIS alleges new facts as well, namely, the numerous bids lost by USIS from 2003 through 2007 due to threats, slowdowns, and vandalism by Local 3 members. The question is whether "the facts essential to the second claim were already present in the first suit." Waldman, 207 F.3d at 112 (emphasis omitted).

The essential facts in any § 1 claim involve the formation of a conspiracy in restraint of trade. The Amended Complaint in the current litigation is vague as to when the conspiracy was formed between Local 3 and the defendant subcontractors. It characterizes all of the facts alleged, from the late 1990s

through 2007, as "clearly tend[ing] to establish a concerted effort by IBEW Local No. 3 and the electrical contractors who employ its members, to exclude CWA workers from the relevant market." (Amended Complaint ¶ 53.) As discussed above, the court in the prior litigation determined that the Eccles Letter, Nead Memo, and Local 3 Meeting were not part of a conspiracy in restraint of trade. If the current position of USIS is that the meeting, letter, and memo are essential to the formation of the conspiracy, then this suit would be precluded as involving "nothing more than additional instances of what was previously asserted." Id. at 113. However, if a conspiracy was formed subsequent to the events of the prior litigation, then preclusion would not be appropriate.

Some passages in the Amended Complaint seem to indicate that USIS is alleging the same conspiracy formation that it alleged in the last action. For instance, USIS states (1) "[b]ecause the tactics agreed upon between the conspiring union and the electrical contractors were so successful, defendants, together with other unnamed coconspirators, continued the conduct, begun years earlier, during the period between April 2002 and the present" (Amended Complaint ¶ 52), and (2) "at least one meeting was held wherein IBEW Local No. 3 contractors raised the issue [of competition with the CWA] and, as it had historically done, IBEW Local No. 3 devised a plan to ensure that the CWA employers

would be unable to compete" (id. ¶ 49).  USIS also describes the
Eccles Letter, Nead Memo, and Local 3 Meeting under the headline
"Violations of the Antitrust Laws."

At this point in the pleadings, it is necessary to draw all
reasonable inferences in favor of the plaintiff.  It could
reasonably be inferred that the defendant subcontractors, who
benefited over the course of the past four years from the threats
and vandalism caused by Local 3, became complicit in that
activity subsequent to the events of the prior litigation.
Therefore, claim preclusion under Waldman does not apply on the
face of the complaint.


**B.    Specificity and plausibility**

Stating a claim under 15 U.S.C. § 1 "requires a complaint
with enough factual matter (taken as true) to suggest that an
agreement was made" in restraint of trade.  Twombly, 127 S. Ct.
at 1965.  A plaintiff must offer "plausible grounds to infer an
agreement," which means "enough fact to raise a reasonable
expectation that discovery will reveal evidence of illegal
agreement."  Id.

The Twombly Court emphasized that a bare assertion of
conspiracy at an unknown time would not suffice to state a claim:

> an allegation of parallel conduct and a bare assertion
> of conspiracy will not suffice.  Without more, parallel
> conduct does not suggest conspiracy, and a conclusory

allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

Id. at 1966.

USIS argues that Twombly should be limited to cases of parallel conduct. The Second Circuit has already asked whether Twombly "might be limited to, or at least applied most rigorously in, the context of either all section 1 allegations or perhaps only those section 1 allegations relying on competitors' parallel conduct." Iqbal v. Hasty, 490 F.3d 143, 156 (2d Cir. 2007), cert. granted, 128 S. Ct. 2931.[3] The Iqbal Court was "reluctant to assume that all of the language of [Twombly] applies only to section 1 allegations based on competitors' parallel conduct or, slightly more broadly, only to antitrust cases." Iqbal, 490 F.3d

---

[3]

The questions presented in the petition for certiorari are (1) "Whether a conclusory allegation that a cabinet-level officer or other high-ranking official knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts purportedly committed by subordinate officials is sufficient to state individual-capacity claims against those officials under Bivens," and (2) "Whether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials." Petition for a writ of certiorari on behalf of John D. Ashcroft, former Attorney General of the United States, and Robert Mueller, Director of the Federal Bureau of Investigation, et al. (No. 07-1015).

at 157.  The <u>Iqbal</u> Court determined that the Supreme Court in

<u>Twombly</u>

> is not requiring a universal standard of heightened
> fact pleading, but is instead requiring a flexible
> "plausibility standard," which obliges a pleader to
> amplify a claim with some factual allegations in those
> contexts where such amplification is needed to render
> the claim <u>plausible</u>.

<u>Iqbal</u>, 490 F.3d at 157-58.  It is clear, therefore, that the

Second Circuit has declined to restrict <u>Twombly</u>'s requirements to

claims under § 1 of the Sherman Act.

Furthermore, the acts complained of here could be fairly

characterized as a kind of parallel conduct.  Each of the

defendant subcontractors is alleged to have taken from USIS a

contract for telecommunications wiring, in the wake of pressure

exerted on the general contractor by Local 3 members.  The

question, then, is whether USIS has "placed" the actions of the

defendant subcontractors "in a context that raises a suggestion

of a preceding agreement."  <u>Twombly</u>, 127 S. Ct. at 1966.

As discussed above, USIS is foreclosed from asserting that

the Local 3 Meeting formed or furthered the conspiracy.  To

provide context that raises the suggestion of an antitrust

agreement, USIS may only rely on events that postdate the prior

litigation.  Relying only on those events, USIS has provided a

sufficient factual context as required by <u>Twombly</u>.  USIS alleges

several instances where, after Local 3 forced a general

contractor to abandon CWA labor, the contract went to one of the defendant subcontractors.  For the purposes of this motion, it is assumed to be true that Local 3 sabotages building sites where CWA labor has been hired or is about to be hired.  The fact that the defendant subcontractors are the longtime beneficiaries of Local 3's illegal activities does "raise a reasonable expectation that discovery will reveal evidence" that the subcontractors have joined Local 3 in an antitrust conspiracy.  <u>Id</u>. at 1965.  In addition, the Amended Complaint alleges that Stan Williams of Clifford Chance was told by a building site representative that "Nead Electric was taking the position that it would not put in conduit unless there were IBEW Local No. 3 wires going through them."  (Amended Complaint ¶ 52(e).)  "Nead Electric ... was displeased because they were not getting work from Clifford Chance and had complained to the union," and Mr. Williams "was visited by an IBEW Local No. 3 shop steward who reiterated the position that the Nead electricians would not install any more conduit if a CWA contractor was allowed to pull the cables through them."  (<u>Id</u>.)  It is unclear from this allegation precisely what Nead Electric said to its union members when it "complained," but a reasonable inference is that Nead Electric's management told its electricians to threaten a slowdown.  This allegation adds plausibility to the allegation that there is an

antitrust conspiracy between Local 3 and the subcontractor defendants.

In sum, the Amended Complaint provides specific and plausible grounds from which to infer an antitrust conspiracy between the defendant subcontractors and Local 3.

## C. **Remaining defenses**

Defendants also argue that the tortious interference claim against the subcontractor defendants should be dismissed under Twombly. For reasons substantially similar to those discussed above, USIS has successfully stated a claim against the defendant subcontractors for tortious interference. According to the Amended Complaint, USIS bids over the course of many years were accepted and then taken away by general contractors, under pressure from Local 3. The contracts were then awarded to the defendant subcontractors, the longstanding beneficiaries of the slowdown tactics of Local 3. It is plausible to infer from these facts that the subcontractor defendants aided in the interference with USIS's contracts. The facts alleged are sufficient to support a claim for tortious interference, which requires the existence of a contract, defendants' knowledge of that contract, intentional procurement of a breach, and damages. White Plains Coat & Apron Co., Inc. v. Cintas Corp., 8 N.Y.3d 422, 426 (2007).

Defendants argue that USIS has alleged only harms to itself, not the requisite adverse effect on competition as a whole in the market for telecommunications wiring.  Yet, according to the Amended Complaint, Defendants' conspiracy has deprived all CWA contractors of telecommunications work, not just USIS, and higher prices have resulted.  <u>See</u>, <u>e.g.</u>, Amended Complaint ¶¶ 24 & 40.

Finally, Defendants argue that the antitrust claim is barred by the nonstatutory labor exemption from the antitrust laws. <u>Clarett v. National Football League</u>, 369 F.3d 124, 130-43 (2d Cir. 2004); <u>Brown v. Pro Football, Inc.</u>, 518 U.S. 231, 243-50 (1996).  Courts will withhold antitrust scrutiny "as far as is necessary to ensure the successful operation of the collective bargaining process."  <u>Clarett</u>, 369 F.3d at 142-43 (emphasis omitted).  The threats, slowdowns, and vandalism complained of by USIS were not part of the collective bargaining process between Local 3 and the defendant subcontractors.  Therefore, the nonstatutory exemption does not apply here.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6) is denied.

SO ORDERED.

Date:      New York, New York
           September 2, 2008

                              S/_____
                                   MIRIAM GOLDMAN CEDARBAUM
                                   United States District Judge